**Pursuant to Ind.Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.**



ATTORNEYS FOR APPELLANT:

**ANN H. STEWART**
**KATHLEEN K. SHORTRIDGE**
Ice Miller LLP
Indianapolis, Indiana

ATTORNEY FOR APPELLEE:

**RANDAL M. KLEZMER**
Klezmer Maudlin, P.C.
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | | |
|---|---|---|
| MARION COUNTY HEALTH DEPARTMENT, | ) | |
| | ) | |
| Appellant/Defendant, | ) | |
| | ) | |
| vs. | ) | No.  93A02-1402-EX-69 |
| | ) | |
| EDWARD HILL, | ) | |
| | ) | |
| Appellee/Plaintiff. | ) | |

APPEAL FROM THE INDIANA WORKER'S COMPENSATION BOARD
The Honorable Linda Peterson Hamilton, Chairman
Application No. C-203789

**July 9, 2014**

**MEMORANDUM DECISION - NOT FOR PUBLICATION**

**VAIDIK, Chief Judge**

**Case Summary**

An employee injured on the job underwent back surgery without prior approval from his employer. We conclude that the employee demonstrated "good reason" for the unauthorized medical care and therefore affirm the Full Worker's Compensation Board's decision to award the employee compensation and benefits related to his unauthorized medical care.

**Facts and Procedural History**

Hill has been employed by the Marion County Health Department ("Health Department") as an administrative assistant in the Mosquito Control Division since 2000. On April 22, 2009, Hill, sixty-three years old, felt a muscle pull in his lower back while he was lifting and carrying tables. *See* Tr. p. 52 (Joint Stipulation of Facts). He reported his injury to the Health Department that day. The Health Department authorized medical treatment for Hill's injury through Wishard Health Services Occupational Health Clinic ("the Clinic") and later Dr. Joseph Bergeron.[1]

Hill was seen at the Clinic on April 23.[2] He complained of lower back pain that radiated into his right buttock with a burning and stinging sensation. *Id.* at 58. Hill was prescribed ibuprofen and told to use ice. *Id.* He was released to work without any restrictions. *Id.* at 62. Hill returned to the Clinic the next day and saw Dr. Gino Alberto, an osteopathic doctor. Hill complained of pain in his lower back with a burning and

---

[1] Wishard Health Services Occupational Clinic was the authorized medical provider for purposes of Indiana Code section 22-3-3-4. Wishard Health Services, the public-health division of Health and Hospital Corporation of Marion County, is now known as Eskenazi Health.

[2] Hill noted in his prior medical history that he had back injuries in 1978, 1980, 1983, and 1996.

2

stinging sensation into his right buttock. *Id.* at 63. Dr. Alberto noted no radiation or weakness and that the straight-leg-raise test was negative.[3] *Id.* Dr. Alberto prescribed Vicodin and released Hill to work without any restrictions. *Id.* at 65-66. On April 30, eight days after the injury, Hill returned to the Clinic and complained that his lower back felt like it was in a knot, the pain still radiated to his right buttock, and his right foot now felt numb. *Id.* at 69. Dr. Alberto prescribed Naproxen. *Id.* at 70.

Hill reported on May 7 that he was "[n]ot any better." *Id.* at 74. While he "did have some good days," he had begun "to hurt again," and the pain was radiating down his right leg. *Id.* Dr. Alberto's examination indicated tenderness at the lumbar paraspinals and decreased sensation to light touch of Hill's right foot and lateral right leg. Dr. Alberto noted that the straight-leg-raise test was negative and that there was "no radiculopathy."[4] *Id.* at 74. Hill was referred to physical therapy.

Hill underwent several physical-therapy sessions, but physical therapy did not help. So Hill was referred back to the Clinic.

Hill saw Dr. Alberto again on May 20. Hill said he felt like he had a knot in his lower back (mid to right) and an ache that radiated down his right leg. Dr. Alberto prescribed Vicodin and Naproxen and released Hill to work without any restrictions. *Id.* at 87, 89.

---

[3] The straight-leg-raise test is the most sensitive test for lumbar-disk herniation, with a negative result strongly indicating against lumbar-disk herniation. *See* American Academy of Family Physicians, *Acute Lumbar Disk Pain: Navigating Evaluation and Treatment Choices*, http://www.aafp.org/afp/2008/1001/p835.html (last visited June 24, 2014).

[4] Radiculopathy is a pinched nerve in the spine. It occurs when surrounding bones, cartilage, muscle, or tendons deteriorate or are injured. The trauma causes these tissues to change position so that they exert extra pressure on the nerve roots in the spinal cord. *See* Healthline, *Radiculopathy (Pinched Nerve)*, http://www.healthline.com/health/radiculopathy#Overview1 (last visited June 24, 2014).

Hill returned to the Clinic for a follow-up visit on June 3. Dr. Alberto noted "essentially no improvement." *Id.* at 94. Dr. Alberto ordered an MRI for right L5-S1 radiculopathy. *Id.* at 95. The MRI revealed central to right-central disc extrusion at L4-L5 in contact with the right L5 nerve root. *Id.* at 98. When Hill returned to the Clinic on June 11, he continued to complain of pain in his lower back that radiated to his right leg. Dr. Alberto prescribed Vicodin and Naproxen and referred Hill to Dr. Joseph Bergeron, a physical-medicine and rehabilitation doctor.

Hill saw Dr. Bergeron on June 17. Dr. Bergeron noted that Hill had discomfort with palpation in his lower lumbar region, most notably with palpation in his right lumbosacral gluteal region along the iliac crest and approaching the sacroiliac region. Dr. Bergeron also noted that the straight-leg-raise test was negative. Dr. Bergeron reviewed Hill's MRI films and acknowledged a small right paracentral protrusion at L5-S1. He described this as "modest without notable displacement of any lumbar nerve roots." *Id.* at 106. Dr. Bergeron's assessment was that Hill's pain was largely "myofascial[5] in nature, specifically pertaining to a right lumbosacral or gluteal strain. A component of pain may be related to aggravation of the lumbar degenerative changes noted on his MRI." *Id.* Dr. Bergeron did not find any verifiable radicular signs. *Id.* at 107. Dr. Bergeron discontinued physical therapy, administered a trigger-point injection, prescribed Ultram, and imposed a twenty-pound lifting restriction at work. *Id.*

---

[5] "Myofascial" means "of or relating to the fasciae of muscles." Merriam-Webster Online Dictionary, http://www.merriam-webster.com/medical/myofascial (last visited June 24, 2014).

Hill returned to Dr. Bergeron on June 24. Hill reported a significant, but temporary, reduction in pain after his injection. Dr. Bergeron prescribed the muscle relaxer Flexeril as well as physical therapy. *Id.* at 110.

Hill received an initial evaluation at Advanced Physical Therapy Associates on June 30. Hill reported constant lower back pain with pain radiating down his right leg into his foot. Hill's treatment plan included physical therapy three times a week for two weeks.

Hill returned to Dr. Bergeron on July 10. Hill reported that he was "essentially unchanged" and that physical therapy was not "helpful." *Id.* at 123. Likewise, Dr. Bergeron's assessment of Hill was unchanged. Hill underwent an epidural steroid injection on July 15. *Id.* at 128.

Hill was last seen by Dr. Bergeron on July 24. Hill reported reduction in pain after his steroid injection. However, Hill said that the pain had returned and that he continued to notice discomfort. *Id.* at 137. Hill also reported that his work restrictions did not impact his usual work activity as an administrative assistant. Dr. Bergeron concluded that Hill was at "maximal medical improvement," there was no indication that he had sustained a ratable impairment to his lumbar spine, and his "total whole person permanent partial impairment rating is therefore zero percent." *Id.* Dr. Bergeron prescribed Ultram and Flexeril and released Hill from his care without any restrictions. *Id.* at 137, 138.

On September 2 Hill sought further medical treatment on his own with Dr. Paul Kraemer, an orthopedic spine surgeon with Wishard, although not an employer-authorized treating physician. Hill's treatment with Dr. Kraemer was processed through his own health insurance. At this appointment, Hill described his back pain as "severe" and

5

shooting down his right leg; Hill also said he had a numbing sensation in his right foot. *Id.* at 141. Dr. Kraemer noted that the straight-leg-raise test was negative. Dr. Kraemer diagnosed Hill with disk herniation on the right side causing some right L5 nerve root compression. *Id.* at 141.

On September 17 Hill returned to see a nurse at the Clinic. Unlike before, Hill was now using a cane and missing work. *Id.* at 143. Hill reported that he had seen Dr. Kraemer and was told that he needed surgery. When the nurse asked Hill why he had not returned to the Clinic, Hill responded that the Clinic "could not do anything" for him. *Id.* at 143. The nurse told Hill that she had to discuss the case with worker's compensation and the doctor and that his claim may not be covered through worker's compensation. *Id.* In the meantime, on September 23 Hill underwent a right selective L5 nerve root block through Dr. Kraemer's office. *Id.* at 145. Then, on October 1 Hill saw Dr. Alberto, who advised him that if he wanted to be treated by Dr. Kraemer, he would be personally responsible for his medical expenses. *Id.* at 146. Dr. Alberto also told Hill that "if" he felt his injury was work-related and it was deemed to be work-related, "we would care for him and refer." *Id.*

On January 6, 2010, Dr. Kraemer performed back surgery (a laminectomy with partial discectomy) on Hill. *Id.* at 186. At his follow-up two weeks later, Hill had good relief of his leg pain and improving back pain. *Id.* Although Dr. Kraemer said Hill had "less than the usual result of a discectomy"—which is not uncommon when worker's compensation patients return to work—he noted that Hill was making "no progress" under the direction of Dr. Bergeron. *Id.* at 187.

Hill was off work from September 2, 2009, to January 27, 2010, which is when he was in treatment with Dr. Kraemer and rehabilitating from surgery.

Hill filed an adjustment for claim against the Health Department on April 5, 2010. Appellant's App. p. 13. A hearing was held before a single-hearing member of the Worker's Compensation Board on May 22, 2013. Both parties were represented by counsel. Hill testified that when Dr. Bergeron released him from care without restrictions on July 24, 2009, he was still having a lot of pain in his lower back and right leg. Tr. p. 20, 22. As a result of the pain, Hill decided to seek care elsewhere because he needed to get better and neither Dr. Alberto nor Dr. Bergeron made him any better. *Id.* at 20, 24. Hill also testified that after he informed the Clinic that Dr. Kraemer said he needed surgery, Dr. Alberto offered to send him back to Dr. Bergeron; however, Hill did not want to go back to Dr. Bergeron. *Id.* at 42. In addition, Hill testified that he was better after the January 6, 2010, surgery with Dr. Kraemer. *Id.* at 25. Dr. Kraemer agreed that Hill was better after the January 2010 surgery and assessed him a 13% permanent partial impairment of the whole person as a result of his April 22, 2009, injury. Appellant's App. p. 20-21. Finally, Hill testified that he had additional back surgery after his January 2010 surgery, but the subsequent surgery was not related to his worker's compensation claim. Tr. p. 26-27.

The single-hearing member issued extensive findings and conclusions awarding Hill statutory medical benefits for all treatment provided by Dr. Kraemer and related medical providers for treatment of his disc injury at L4-5 from July 24, 2009, through January 27, 2010. *See* Appellant's App. p. 6-12. Hill was also awarded temporary total

disability benefits from September 2, 2009, through January 27, 2010, and a 13% permanent partial impairment of the whole person as a result his April 22, 2009, injury. *Id.* Finally, Hill's attorney was awarded attorney fees on his outstanding medical bills pursuant to Indiana Code section 22-3-1-4. *Id.*

The Health Department appealed to the Full Worker's Compensation Board. The Full Board heard arguments of counsel, following which all members of the Board affirmed the decision of the single-hearing member. *Id.* at 4-5. The Health Department now appeals.

## Discussion and Decision

The Health Department contends that the Worker's Compensation Board erred in ordering it to pay for Hill's back surgery because he did not seek prior approval for the surgery and did not meet an exception when prior approval is not required.

The Worker's Compensation Board, as the trier of fact, has a duty to issue findings that reveal its analysis of the evidence and that are specific enough to permit intelligent review of its decision. *Wright Tree Serv. v. Hernandez*, 907 N.E.2d 183, 186 (Ind. Ct. App. 2009), *trans. denied*. In reviewing a worker's compensation decision, an appellate court is bound by the factual determinations of the Worker's Compensation Board and may not disturb them unless the evidence is undisputed and leads inescapably to a contrary conclusion. *Christopher R. Brown, D.D.S., Inc. v. Decatur Cnty. Mem'l Hosp.*, 892 N.E.2d 642, 646 (Ind. 2008). We examine the record only to determine whether there is substantial evidence and reasonable inferences that can be drawn therefrom to support the Worker's Compensation Board's findings and conclusion. *Id.* As to the Worker's Compensation Board's interpretation of the law, an appellate court employs a deferential standard of

review to the interpretation of a statute by an administrative agency charged with its enforcement in light of its expertise in the given area. *Id.* The Worker's Compensation Board will be reversed only if it incorrectly interpreted the Worker's Compensation Act. *Id.*

Indiana Code section 22-3-3-4 provides in relevant part:

(a) After an injury and prior to an adjudication of permanent impairment, the employer shall furnish or cause to be furnished, free of charge to the employee, an attending physician for the treatment of the employee's injuries, and in addition thereto such services and products as the attending physician or the worker's compensation board may deem necessary. . . .

(b) During the period of temporary total disability resulting from the injury, the employer shall furnish the physician, services and products, and the worker's compensation board may, on proper application of either party, require that treatment by the physician and services and products be furnished by or on behalf of the employer as the worker's compensation board may deem reasonably necessary.

\* \* \* \* \*

(d) If, because of an emergency, or because of the employer's failure to provide an attending physician or services and products, or treatment by spiritual means or prayer, as required by this section, or because of any other good reason, a physician other than that provided by the employer treats the injured employee during the period of the employee's temporary total disability, or necessary and proper services and products are procured within the period, the reasonable cost of those services and products shall, subject to the approval of the worker's compensation board, be paid by the employer.

Our courts have long held that under the foregoing statute an employee generally is not free to elect at the employer's expense additional treatment or physicians other than those tendered by the employer. *Daugherty v. Indus. Contracting & Erecting*, 802 N.E.2d 912, 915-16 (Ind. 2004) (citing *K-Mart v. Morrison*, 609 N.E.2d 17, 33 (Ind. Ct. App. 1993), *trans. denied*; *Richmond State Hosp. v. Waldren*, 446 N.E.2d 1333, 1336 (Ind. Ct. App.

9

1983); *Perez v. U.S. Steel Corp.*, 172 Ind. App. 242, 359 N.E.2d 925, 927 (1977)). This

view is consistent with the majority rule, which provides:

> [I]t is generally held that the employee should ordinarily not incur medical expense without first giving the employer a reasonable opportunity to furnish such services, and an employee who does so will be liable for that expense. The mere fact that claimant has more faith in the family doctor, or lacks confidence in the employer's doctor, is not enough to change the rule.

*Id.* at 916 (quoting 5 Arthur Larson & Lex K. Larson, *Workers' Compensation Law* §

94.02[3] (2002). Nonetheless, the statute allows the employee to select medical treatment

under three circumstances: (1) in an emergency; (2) if the employer fails to provide needed

medical care; or (3) for other good reason. Ind. Code § 22-3-3-4(d); *Daugherty*, 802 N.E.2d

at 916.

Thus, the question in this case is whether Hill was required to seek approval from

the Worker's Compensation Board or the Health Department before undergoing back

surgery. *See Daugherty*, 802 N.E.2d at 917. The answer is generally yes. *Id.* However,

no prior approval is necessary: (1) in an emergency; (2) if the employer fails to provide

needed medical care; or (3) for other good reason. *Id.* At issue here is the "other good

reason" exception.

> Our Supreme Court explained in *Daugherty*:

> When an employee seeks treatment other than that provided by the employer or the [Worker's Compensation Board], he or she does so at his or her own peril and risks not being reimbursed. The mere fact that the unauthorized medical treatment is an acceptable method of treating the condition does not mean that the employer should pay for the treatment. However as Professor Larson observes:

> > [D]ifficult questions can arise when there is a difference of opinion on diagnosis or appropriate treatment, as when the

10

> employer's doctor recommends conservative measures while the claimant thinks he or she should have surgery.

> 5 Larson, *Larson's Workers' Compensation Law* § 94–02[5], at 94-19 (2002). "One way to settle this kind of controversy is to let the result turn on whose diagnosis proved to be right." *Id.* Several jurisdictions have embraced this approach.

802 N.E.2d at 917. Our Supreme Court found a Virginia case, *Shenandoah Products, Inc. v. Whitlock*, 421 S.E.2d 483 (Va. Ct. App. 1992), "particularly persuasive." *Daugherty*, 802 N.E.2d at 918. In *Whitlock*, the employee suffered a work-related lower back injury and was treated by several doctors, one of whom was designated as the authorized treating physician. After reviewing tests from a physical therapist and neurologist, the treating physician concluded that the employee could return to work without restrictions. Apparently still in pain and dissatisfied with the evaluation, the employee sought the advice of a specialist for a neurosurgical evaluation. At the specialist's suggestion, the employee underwent surgery. Before doing so, both the employer and treating physician refused authorization for treatment. The State of Virginia's Worker's Compensation Commission awarded medical expenses to the employee on grounds that she "'benefited from the surgery.'" *Id.* (quoting *Whitlock*, 421 S.E.2d at 485). The employer appealed, contending that the surgery was not authorized and therefore the employer was not liable for payment. Construing a worker's compensation statute similar to our own, the Virginia Court of Appeals noted that without a referral from an authorized treating physician, treatment by an unauthorized physician is allowed in an "'emergency'" or "'for other good reason.'" *Id.* (quoting *Whitlock*, 421 S.E.2d at 485). In that case there was no question that the treatment the employee received was not required due to an emergency. However, acknowledging

11

this was a case of first impression in Virginia and citing authority from other jurisdictions, the Virginia Court of Appeals fashioned the following test:

> [I]f the employee, without authorization but in good faith, obtains medical treatment different from that provided by the employer, and it is determined that the treatment provided by the employer was inadequate treatment for the employee's condition and the unauthorized treatment received by the claimant was medically reasonable and necessary treatment, the employer should be responsible, notwithstanding the lack of prior approval by the employer. These legal principles which provide a basis for the payment of unauthorized medical treatment are part of the "other good reasons test."

*Id.* (quoting *Whitlock*, 421 S.E.2d at 486 (citations omitted)).

Our Supreme Court agreed with Virginia's approach and adopted the test as appropriate for evaluating the existence of good reason under Section 22-3-3-4. *Id.* at 918-19. The Court added that the test was consistent with the longstanding rule in this State: the terms of the Worker's Compensation Act are to be liberally construed so as to effectuate the humane purposes of the Act, and doubts in the application of terms are to be resolved in favor of the employee. *Id.* at 919. Finally, our Supreme Court noted that reimbursement for medical treatment not authorized by the employer or the Worker's Compensation Board should be the rare exception. *Id.*

Using the *Daugherty* test, the Health Department argues that Hill did not (1) obtain medical treatment from Dr. Kraemer in good faith, (2) prove that the medical care it provided was inadequate, and (3) prove that the unauthorized treatment was medically reasonable and necessary. On these points, the single-hearing member concluded:

> Here, Dr. Bergeron, a physiatrist, released [Hill] from further medical care while [Hill] was clearly still symptomatic. He dismissed or ignored [Hill's] continued and consistent complaints of radicular lower extremity symptoms on the basis that his objective testing failed to verify a radicular component to [Hill's] presentation. This was done even though diagnostic testing (an

12

MRI) correlated with [Hill's] subjective complaints (presence of a disc bulge at L4-5 with nerve root compression). In addition, [Hill] was found to be a credible witness and there is no evidence whatsoever that [Hill's] degenerative spine condition had been symptomatic in the 13 years preceding [his] work injury. Dr. Kraemer, an orthopedic spine surgeon, opined that [Hill] had sustained a lumbar disc injury with nerve root compression as a result of his work injury of April 22, 2009. Dr. Kraemer's surgery medically benefitted [Hill]. The Defendant was timely advised of [Hill's] need for additional medical treatment and contemplated spine surgery with an orthopedic surgeon. Instead of referring [Hill] to an orthopedic surgeon of its own choice for further evaluation, the Defendant offered to refer [Hill] back to Dr. Bergeron, likely an effort in futility, as demonstrated by the facts and circumstances of this case.

While an award of unauthorized medical treatment is, and rightly should be, rare, the undersigned finds, given the totality of the circumstances, that [Hill] had good cause for seeking treatment with Dr. Kraemer and the evidence further establishes that the treatment provided by Dr. Kraemer was reasonable and necessary and improved [Hill's] medical condition. Consequently, the undersigned concludes that the greater weight of the credible evidence establishes that [Hill] suffered an L4-5 disc injury as a result of his accidental injury of April 22, 2009 and is entitled to an award of statutory medical expenses for the medical evaluation, treatment, and care of this injury provided by Dr. Kraemer subsequent to Dr. Bergeron's release of July 24, 2009 though Dr. Kraemer's post-operative visit of January 27, 2009.
. . .

Appellant's App. p. 11.

As for good faith, the record shows that Hill sought treatment from Dr. Kraemer without obtaining approval of the Health Department or the Worker's Compensation Board. When Dr. Bergeron released Hill from his care on July 24, Hill was still in pain, and there was an MRI to support Hill's complaints. Physical therapy had not worked, and although the steroid injection had helped, it did so only temporarily. Hill saw Dr. Kraemer on September 2; he told the Clinic on September 17 that Dr. Kraemer had recommended surgery. Dr. Alberto told Hill on October 1 that "if" his injury was determined to be work-related (although Dr. Alberto had already treated Hill on several occasions for his work-

13

related injury), they would treat and refer him; however, if Hill continued to seek treatment from Dr. Kraemer, he would be personally responsible for the medical expenses. Tr. p. 146. Hill testified at the hearing that Dr. Alberto would refer him back to Dr. Bergeron, which the single-hearing member found to be "an effort in futility" given the facts in this case. Appellant's App. p. 11. Based on these facts, we find that Hill acted in good faith when he sought treatment from Dr. Kraemer without obtaining approval of the Health Department or the Worker's Compensation Board.

The record also shows that the course of treatment being offered by the Health Department was inadequate. Despite the efforts of two physicians and other health-care professionals, Hill still suffered pain in his lower back and right leg/foot and was getting progressively worse. In fact, at his September 17 visit to the Clinic, Hill was using a cane and not working even though Dr. Bergeron had concluded less than two months earlier that Hill was at "maximal medical improvement," there was no indication that he had sustained a ratable impairment to his lumbar spine, and his "total whole person permanent partial impairment rating [wa]s . . . zero percent." Tr. p. 137, 143.

Finally, the single-hearing member found that Dr. Kraemer's treatment was "reasonable and necessary" and had "improved [Hill's] medical condition." Appellant's App. p. 11. We agree. The record shows that both Hill and Dr. Kraemer found that the surgery had improved Hill's condition, even if less than the usual amount, and that Hill was making "no progress" under the direction of Dr. Bergeron. Tr. p. 186-87. In sum, the record is sufficient to demonstrate that Hill's decision to obtain unauthorized medical care fell under the "other good reason" exception to the general rule that an employee is not free

14

to elect, at the employer's expense, additional treatment or physicians other than those tendered by the employer.  We therefore affirm the Full Board.

Affirmed.

NAJAM, J., and BROWN, J., concur.